

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: ) | Case No. 15-20840-B-11 |
| ) | |
| TOLLENAAR HOLSTEINS, a ) | Jointly Administered with |
| California general partnership, ) | Case Nos. 15-20842-B-11 and |
| ) | 15-20844-B-11 |
| Debtor. ) | |
| ) | DC No. RAL-9 |
| FRIENDLY PASTURES, LLC, an ) | |
| Oklahoma limited liability ) | |
| company, ) | |
| ) | |
| Debtor. ) | |
| ) | |
| T BAR M RANCH, LLC, an Oklahoma ) | |
| limited liability company, ) | |
| ) | |
| Debtor. ) | |



**FILED**

OCT - 5 2015

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

**MEMORANDUM DECISION GRANTING TRUSTEE'S MOTION TO SURCHARGE COLLATERAL**

**INTRODUCTION**

Presently before the court is a *Motion to Surcharge Collateral* filed by Russell K. Burbank, the trustee appointed in the above-captioned jointly-administered chapter 11 cases. The trustee seeks to surcharge the collateral of secured creditors Bank of the West and Hartford Accident and Life Insurance Company under 11 U.S.C. § 506(c) for expenses incurred in the administration of the Tollenaar Holsteins, Friendly Pastures, and T Bar M Ranch chapter 11 cases. Section 506(c) permits a trustee to surcharge a secured creditor's collateral for the reasonable and necessary expenses incurred in preserving or disposing of

1

collateral for the benefit of a secured creditor.[1]  The surcharge
initially requested was $278,794.43.  That amount appears to have
been revised by the trustee to $269,354.82, and is allocated
$153,393.46 to Bank and $115,961.36 to Hartford.

The trustee's surcharge motion was initially heard on August
11, 2015.  Proper notice was given to all required parties and
parties in interest.  Appearances were noted on the record.

During the initial hearing on August 11, 2015, the court
expressed skepticism as to whether the trustee sufficiently
identified and quantified any benefit to Bank and Hartford
related to the expenses for which the trustee seeks to surcharge
these secured creditors' collateral.  The court also noted there
appeared to be an absence of any express consent to a surcharge
by Bank and/or Hartford.  Nevertheless, the court requested
additional briefing on the consent issue.  The initial hearing
was continued to September 6, 2015, then to September 15, 2015,
and finally to October 6, 2015.  The October 6, 2015, was
rendered unnecessary by this decision.

The court has reviewed and considered the entire docket in
this matter including, but not limited to, the trustee's motion,
Bank's and Hartford's oppositions, the trustee's reply, and the
exhibits and declarations (including all supplemental

---

[1]11 U.S.C. § 506(c) states as follows:

The trustee may recover from property securing an
allowed secured claim the reasonable, necessary costs
and expenses of preserving, or disposing of, such
property to the extent of any benefit to the holder of
such claim, including the payment of all ad valorem
property taxes with respect to the property.

2

1  declarations) submitted in support of the motion, oppositions,

2  and reply.  The court has also considered the trustee's, Bank's,

3  and Hartford's supplemental points and authorities on the consent

4  issue.  And the court heard and has fully considered the

5  statements and arguments of counsel made on the record in open

6  court on August 11, 2015.

7      The court is persuaded that the trustee has demonstrated

8  that some reasonable and necessary expenses benefitted Bank and

9  Hartford directly and those benefits have been sufficiently

10  quantified.  The court is also persuaded that § 506(c)

11  incorporates the pre-Code practice that allowed a bankruptcy

12  court to surcharge a secured creditor's collateral based on

13  express or implied consent, or when the secured creditor caused

14  the expenses to be surcharged.  And the court is persuaded that

15  by their active involvement in these cases that was more than

16  mere cooperation with the trustee, Bank and Hartford consented to

17  a surcharge.  Therefore, for the reasons explained below, the

18  trustee's motion will be GRANTED.

19      This memorandum decision constitutes the court's findings of

20  fact and conclusions of law pursuant to Federal Rule of Civil

21  Procedure 52(a) made applicable by Federal Rule of Bankruptcy

22  Procedure 7052 and 9014.

23

24  **JURISDICTION AND VENUE**

25      Federal subject-matter jurisdiction is founded on 28 U.S.C.

26  § 1334. This matter is a core proceeding that a bankruptcy judge

27  may hear and determine.  28 U.S.C. §§ 157(b) (2) (A), (B) and

28  (O).  To the extent it may ever be determined to be a matter that

3

1    a bankruptcy judge may not hear and determine without consent,
2    the parties nevertheless consent to such determination by a
3    bankruptcy judge. 28 U.S.C. § 157(c)(2). Venue is proper under 28
4    U.S.C. § 1409.

5

6    **BACKGROUND**

7        Each of the three debtors in these jointly-administered
8    cases filed voluntary chapter 11 petitions on February 4, 2015.
9    At the commencement of these chapter 11 cases, each of the
10   debtors served as debtors in possession and continued to operate
11   their California and Oklahoma dairies.

12       After several hearings, numerous filings, and argument by
13   the parties, a trustee was ordered appointed on March 17, 2015.
14   Russell K. Burbank was appointed as the trustee in these jointly-
15   administered chapter 11 cases on March 24, 2015.

16       The court ordered the appointment of a trustee after Bank
17   refused to consent to the debtors' use of its cash collateral
18   without adequate protection, which the debtors were unable to
19   provide.  In the absence of adequate protection, Bank would only
20   consent to the use of its cash collateral by a trustee.
21   Ultimately, Bank and Hartford persuaded the court that the
22   appointment of a trustee was in the interest of creditors and the
23   estate.

24       Bank and Hartford are the debtors' primary secured
25   creditors.  They hold liens on substantially all of the debtors'
26   assets.  Bank is owed approximately $4,400,000.00.  It is secured
27   by the debtors' California and Oklahoma dairy herds, feed, milk
28   and milk proceeds, machinery, and other personal property of the

4

debtors.  Hartford is owed approximately $8,400,000.00.  It is
secured by first deeds of trust on California and Oklahoma dairy
facilities and equipment, and a security interest in the debtors'
dairy products and proceeds.

The trustee maintains that a surcharge of Bank's and
Hartford's collateral for expenses incurred in the administration
of these estates is warranted.  In addition to expenses that
produced a direct and quantifiable benefit to Bank and Hartford,
the trustee maintains that Bank and Hartford each consented to a
surcharge for the fees and expenses incurred by the trustee and
the trustee's professionals.

Their collateral now having been either liquidated or
recovered, and thus both secured creditors having milked the
proverbial cow dry, Bank and Hartford oppose the trustee's
surcharge motion.  Both secured creditors maintain the trustee
has not satisfied § 506(c) and they did not consent to any
surcharge.  Bank alternatively maintains that even if a surcharge
is warranted, any surcharge must be allocated between it and
Hartford.

**DISCUSSION**

Surcharges have traditionally been authorized under one of
two tests: (1) an objective test which requires the surcharge
claimant to satisfy the § 506(c) elements by demonstrating
reasonable and necessary expenses that provided a quantifiable
benefit to the secured creditor or (2) a subjective test under
which the surcharge claimant may establish the secured creditor
"consented to" or "caused" the expenses to be surcharged.  See

5

Compton Impressions, Ltd. v. Queen City Bank, N.A. (In re Compton Impressions), 217 F.3d 1256, 1260 (9th Cir. 2000) (citing In re Cascade Hydraulics & Utility Serv., Inc., 815 F.2d 546, 548 (9th Cir. 1987); see also Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp., Inc. (In re Debbie Reynolds Hotel & Casino, Inc.), 255 F.3d 1061, 1068 (9th Cir. 2001); Security Leasing Partners, LP v. ProAlert (In re ProAlert), 314 B.R. 436, 440 (9th Cir. BAP 2004) ("Unless the secured creditor consents to the surcharge, a trustee seeking to recover under § 506(c) must establish that expenses relating to the preservation or disposition of collateral were (1) reasonable, (2) necessary, and (3) provided a quantifiable benefit to the secured creditor."). Each is applicable here and each is discussed below.

I.   Surcharge Under the Objective Test:  Direct and Quantifiable Benefit.

The objective test is not easily satisfied because it requires the surcharge claimant to prove that the expenses were reasonable, necessary, and provided a concrete and quantifiable benefit to the secured creditor. Debbie Reynolds, 255 F.3d at 1068. Recovery is also limited to the amount of any benefit and must be proven with specificity. Id. Nevertheless, the court is persuaded that the trustee has met this burden with respect to a limited portion of the surcharge requested.

Hartford's collateral will be surcharged $24,543.79 for expenses incurred in keeping the California dairy a "wet" dairy solely for Hartford's benefit from April 14, 2015, when the trustee's motion to liquidate the California dairy herd was granted, until May 15, 2015, when Hartford's state court receiver

took control of the California dairy.[2]   These expenses were reasonable.  They were also necessary to prevent the loss of valuable permits if the dairy ceased operations as a "wet" dairy and also to prevent a corresponding diminution in value if the permits were lost.[3]  The court is persuaded that the trustee has identified and quantified both the expenses solely attributable to Hartford and the benefit that Hartford derived from these expenses sufficient to satisfy § 506(c).[4]

Hartford's collateral will also be surcharged $11,419.50 for expenses incurred in the operation of the Oklahoma dairy from May 15, 2015, when the last cow was transported off the property, until June 10, 2015, when Hartford's state court receiver took control of the property.  These expenses were reasonable and necessary to secure the Oklahoma property from vandalism, to comply with environmental monitoring regulations mandated by the State of Oklahoma, and to prevent a loss of value if the property

---

[2]This amount takes into account Hartford's $55,000.00 loan to the estate to allow for the redemption of cows from Bank and the repayment of $36,704.68 upon the subsequent sale of California dairy cows.

[3]This is consistent with Hartford's position in this case: "Cessation of dairy operations on the [California dairy] could result in loss of operating permits, greatly reducing the value of the [California dairy]." [dkt. 237 at 2:3-3:3].

[4]Alternatively, these expenses could be allowed on the basis of consent, see, discussion in Section II infra, given Hartford's statement that the "expenses for which Hartford consented were those related to the Tollenaar Holsteins bankruptcy involving the Elk Grove property after liquidation of the livestock[.]"

became pasture land rather than a licensed dairy.[5]  The court is
persuaded that the trustee has identified and quantified expenses
attributable solely to Hartford related to these matters and the
benefit Hartford derived from these expenses sufficient to
satisfy § 506(c).

Based on detailed time records, Bank's collateral will also
be surcharged $46,958.71 and Hartford's collateral will also be
surcharged $24,490.00 for fees that the trustee and the trustee's
professionals incurred for services rendered solely for the
benefit of each of these secured creditors and their respective
collateral.  These fees were approved and allowed without
objection by Bank or Hartford.  And inasmuch as they reflect
specific and detailed activity, the court is persuaded they
describe direct and quantifiable benefits to Bank and Hartford.

In sum, the court is persuaded that the trustee has
satisfied his burden of demonstrating reasonable and necessary
expenses that produced a direct and quantifiable benefit to Bank
and Hartford which are chargeable against their respective
collateral.  Therefore, on the basis that the trustee has
persuaded the court that the elements of § 506(c) and the
objective test are satisfied, at least with respect to the
expenses identified hereinabove, the court will surcharge
Bank's collateral in the initial amount of $46,958.71 and

---

[5]This is also consistent with Hartford's position in this
case: "In addition, Hartford lacks adequate protection of its
interest in [the Oklahoma property], which is in danger of losing
its operating permits unless remediation and repair of the
Oklahoma waster [sic] treatment and disposal system is commenced
immediately, and is concluded expeditiously." [dkt. 316 at 3:11-
14].

Hartford's collateral in the initial amount of $60,453.29 for a total surcharge under the objective test of $107,412.00. That leaves a balance of $161,942.82 to be addressed under the subjective test.

II.    Surcharge Under the Subjective Test: Based on the Consent of Bank and Hartford.

Determining whether Bank and/or Hartford consented to a surcharge requires the court to consider four issues:

(1) Whether consent remains a viable basis upon which a bankruptcy court may surcharge a secured creditor's collateral?

(2) If consent remains a viable basis upon which a bankruptcy court may surcharge a secured creditor's collateral, must a trustee still demonstrate reasonable, necessary expenses that resulted in a quantifiable benefit in addition to consent?

(3) If consent remains a viable basis upon which a bankruptcy court may surcharge a secured creditor's collateral, did Bank and Hartford consent to a surcharge?

(4) How should a surcharge based on consent, if any, be allocated?

A.    First and Second Issues: Viability and Parameters of Consent.

The first issue arises from the BAP's decision in Comerica Bank California v. GTI Capital Holdings, LLC, (In re GTI Capital Holdings, LLC), 2007 WL 7532277 (9th Cir. BAP 2007) – and that is whether consent remains a viable basis under § 506(c) to surcharge a secured creditor's collateral.[6]  The second issue is related to the first, and that is whether the § 506(c) elements must be satisfied in addition to consent.  As explained below,

---

[6]The court recognizes that Comerica is an unpublished memorandum decision.  Nevertheless, the decision is well-reasoned and the court finds the BAP's analysis highly persuasive.

1  the court concludes that consent remains a viable basis to
2  surcharge a secured creditor's collateral and a surcharge may be
3  ordered if *either* the statutory elements of § 506(c) are
4  satisfied, *i.e.*, the "objective test," *or* the secured creditor
5  consented to the surcharge or caused the expenses to be
6  surcharged, *i.e.*, the "subjective test."

7      Consent, or the subjective test, pre-dates the 1978 Code and
8  is inherently an equitable standard.  See In re Hotel Associates,
9  6 B.R. 108 (Bankr. E.D. Pa. 1980) (discussing early cases and
10 noting that consent was often inferred from circumstances or
11 acquiescence, especially when there were no free assets).
12 Section 506(c) has its roots in § 77B of the Bankruptcy Act of
13 1933 under which "mortgaged property could be charged with any
14 allowances which were fairly attributable to activities
15 benefitting a secured creditor, or to which he expressly or
16 impliedly consented, or which he caused."  First Western Savings
17 & Loan v. Anderson, 252 F.2d 544, 547 (9th Cir. 1958).  That
18 principle was carried over and adopted in § 246 of chapter X of
19 the Bankruptcy Act of 1938 (11 U.S.C. § 646) which gave "the
20 judge discretion to determine whether, and to what extent,
21 mortgage creditors should be charged with the general costs of an
22 unsuccessful reorganization proceeding."  Id.[7]

23     These pre-Code equitable principles were captured and
24 codified in § 506(c).  See In re Los Gatos Lodge, Inc., 278 F.3d
25 890, 893 (9th Cir. 2002) ("Section 506(c) had its origins in the

---

27 [7]First Western also identified factors to consider in
exercising this discretion.  Those factors closely resemble those
28 cited in Comerica.  See First Western, 252 F.2d at 548 n. 8.

10

equitable principle that where a court has custody of property, administration and preservation expenses are a dominant charge against the property."); see also ProAlert, 314 B.R. at 442 (Congress intended § 506(c) to be a codification of the pre-Code equitable principle that a lienholder may be charged with the reasonable costs and expenses incurred by the trustee which are required to preserve or dispose of the property subject to lien).

Comerica, however, questioned the continued vitality of consent under § 506(c) in light of the Supreme Court's decision in Hartford Underwriters Ins. Co. v. Union Planters Bank N.A., 530 U.S. 1 (2000). In Comerica, the BAP noted that the Supreme Court focused on the plain and unambiguous language of § 506(c) and made no significant mention of the consent standard. Comerica, 2007 WL 7532277 at *14 (citing Hartford Underwriters, 530 U.S. at 6). The BAP also noted that about six weeks after the Supreme Court decided Hartford Underwriters, the Ninth Circuit decided Compton Impressions in which the court of appeals stated that a surcharge under § 506(c) was appropriate if either the objective test or the subjective test were satisfied. Id. at *14 n. 22. Indeed, Compton Impressions framed the question as an "either" "or" standard: "Under § 506(c), therefore, Compton must demonstrate that the expenses it seeks to surcharge against the Banks were reasonable, necessary, and beneficial to the Banks' recovery, or that the Banks caused or consented to those expenses." Compton Impressions, 217 F.3d at 1260 (citing Cascade Hydraulics, 815 F.2d at 548). Nevertheless, the BAP noted that Compton Impressions did not cite or discuss Hartford Underwriters. And because of that, although it affirmed the

bankruptcy court's surcharge on the basis of consent, the BAP
concluded it was without clear direction from the Ninth Circuit
or the Supreme Court as to the continued vitality of consent.
Comerica, 2007 WL 7532277 at *14.

About a year after the BAP decided Comerica, the Ninth
Circuit decided Weinstein, Eisen & Weiss v. Gill (In re Cooper
Commons LLC), 512 F.3d 533 (9th Cir. 2008).  Although the facts
of that case differ somewhat from the facts of this case, the
underlying legal principle is applicable.  In Cooper Commons, the
debtor's attorneys objected to the payment of administrative
expenses incurred by the trustee and his professionals from a
carve-out the lender initially created from its collateral and
which the trustee later unilaterally and without objection
supplemented from the lender's funds it was holding as additional
collateral.  Id. at 535.  Debtor's attorneys argued that the
trustee's surcharge of lender's collateral to pay for the
estate's administrative expenses required the application of
§ 506(c) which had not been satisfied.  Id. at 536.  The Ninth
Circuit rejected that argument and, in doing so, stated that
"[i]n light of the Lender's consent, there was no need for
§ 506(c) as a statutory hook."  Id.

Cooper Commons is significant for two reasons.  First, it
recognizes that consent remains a viable basis under § 506(c) to
surcharge a secured creditor's collateral even after Hartford
Underwriters and Comerica.  Second, it also recognizes that the
statutory elements and consent are alternative grounds upon which
a court may order a surcharge under § 506(c).

Of course, an alternative reading of Cooper Commons might be

12

1  that the Ninth Circuit did not address the impact of Hartford
2  Underwriters on the continued vitality of consent because that
3  issue was not raised on appeal.  But even assuming that to be the
4  case, the holding of Cooper Commons that it was unnecessary for
5  the trustee to satisfy the elements of § 506(c) because the
6  lender consented to the surcharge, and therefore consent remains
7  a viable and alternate basis upon which a bankruptcy court may
8  surcharge a secured creditor's collateral under § 506(c), is
9  binding on this court.

10       Cooper Commons is also consistent with the weight of recent
11  decisions that find consent - including implied consent as the
12  Ninth Circuit recognized nearly sixty years ago in First Western
13  - remains valid and relevant under § 506(c).  See First Western,
14  252 F.2d at 547; see also In re Strategic Labor, Inc., 467 B.R.
15  11, 22 (Bankr. D. Mass. 2012) ("[W]hile § 506(c) does not require
16  advance consent by the secured creditor, consent is still a
17  relevant consideration."); In re McClean Wine Co., Inc., 463 B.R.
18  838, 855 (Bankr. E.D. Mich. 2011) (surcharge claimant must prove
19  three elements of § 506(c), i.e., reasonableness, necessity, and
20  benefit or, in the alternative, direct or implied consent or
21  expenses were caused); In re Computer Systems, 446 B.R. 837, 842
22  (Bankr. N.D. Ohio. 2011) ("[T]he Court notes that implied consent
23  is a basis for surcharging a secured creditor's collateral
24  pursuant to 11 U.S.C. § 506(c)."); In re Cass, 2015 WL 2194796 at
25  *15 (Bankr. C.D. Cal. 2015) ("In the Ninth Circuit, the trustee
26  is entitled to a surcharge to the extent that the costs incurred
27  were (1) reasonable and necessary and that they benefitted the
28  secured creditor, or (2) consented to by the secured creditor.").

13

1   Based on the foregoing, the court concludes that consent —
2   express and implied – remains a viable basis upon which a
3   bankruptcy court may surcharge a secured creditor's collateral
4   under § 506(c).  The court further concludes that a secured
5   creditor's collateral may be surcharged under § 506(c) if the
6   trustee (or debtor in possession) either (1) satisfies the
7   statutory elements of § 506(c), *i.e.*, reasonableness, necessity,
8   and benefit, or (2) persuades the court that the secured creditor
9   expressly or impliedly consented to a surcharge, or caused the
10  expenses to be surcharged.

11       B.    Third Issue: Existence of Consent.

12   After careful consideration and weighing of the factors
13  listed below, the court is persuaded that Bank and Hartford
14  consented to a surcharge of their collateral for expenses and
15  fees the trustee and the trustee's professionals incurred in
16  these administratively insolvent chapter 11 cases.

17   The court recognizes that limited cooperation with a
18  trustee, even under a consensual cash collateral order, is
19  insufficient from which to infer consent.  Cascade Hydraulics,
20  815 F.2d at 548; In re Flagstaff Foodservice Corp., 739 F.2d 73,
21  76-77 (2d Cir. 1984); but see In re Croton River Club, Inc., 162
22  B.R. 656, 660 (Bankr. S.D.N.Y. 1993) (implying consent from
23  creditor's consent to cash collateral stipulation).  There is
24  also some disagreement over whether seeking the appointment of a
25  trustee is more than mere cooperation and, thus, rises to the
26  level of implied consent.  Compare In re Stein and Day, Inc., 89
27  B.R. 290 (Bankr. S.D.N.Y. 1988) (seeking appointment
28  insufficient) with Hotel Assoc., 6 B.R. 108 (seeking appointment

1    sufficient) and In re Bob Grissett Golf Shoppes, Inc., 50 B.R.
2    598, 609 (Bankr. E.D. Va. 1985) ("A secured creditor who knows
3    the debtor's estate has no unencumbered assets and nevertheless
4    moves for appointment of a trustee cannot by that means transfer
5    to a third party, such as the trustee, the burden of financing
6    the liquidation.").

7        However, in these cases, involvement by Bank and Hartford
8    extended well beyond mere cooperation or seeking to have a
9    trustee appointed.  A review of the docket and record in these
10   cases persuades the court that Bank and Hartford orchestrated the
11   preservation, liquidation, and/or recovery of their collateral
12   through the trustee and the trustee's professionals.  And in so
13   doing, they consented to the resulting administrative expenses.

14            1.   Factors Weighed and Considered in Determining
                   Implied Consent.
15
16       In affirming the bankruptcy court's conclusion that the
     secured creditor bank in Comerica consented to a surcharge, the
17
     BAP focused on a number of factors the bankruptcy court used to
18
     establish implied consent.[8]  Comerica, 2007 WL 7532277 at *6-8.
19
     Those factors are applicable here.
20
             (1)  Comerica caused the bankruptcy court to appoint an
21                examiner with pervasively broad powers.  Because
                  Comerica asked the court to empower the Examiner
22

23   ————————————————
         [8]The bankruptcy court developed these factors after
24   evidentiary hearings.  In this case, the court has the benefit of
     facts developed through numerous hearings on the use of cash
25   collateral, the appointment of a trustee, stay relief motions,
     sale motions, and status conference reports.  Facts developed in
26   those proceedings fit neatly into Comerica factors.  Statements
     by the parties and their counsel may also be treated as
27   evidentiary admissions under Fed. R. Evid. 801(d)(2).  In re
     Applin, 108 B.R. 253, 259 (Bankr. E.D. Cal. 1989).
28

                              15

> to perform these duties, Comerica consented to or
> caused Examiner and his professionals to perform
> these duties.  Comerica, 2007 WL 7532277 at *6.

There is no dispute that Bank moved for the appointment of a trustee in each of the three chapter 11 cases.  Bank knew the expansive powers a trustee would have under § 1106 and Bank capitalized on those powers.  Bank even located its own individual with dairy experience and it urged the court to appoint that individual as the trustee in these cases.  And in proposing a trustee, Bank also emphasized that the purpose of a trustee would be to liquidate Bank's collateral rather than reorganize the debtors' affairs.

Facing a surcharge, Hartford attempts to distance itself from Bank on this point.  During argument on August 11, 2015, Hartford's counsel emphatically stated that Hartford did not seek the appointment of a trustee.  Technically, that statement is accurate.  It is, however, disingenuous.  Although Hartford did not move for the appointment of a trustee, it asked the court to appoint the functional equivalent of a trustee, an estate fiduciary in the form of a court-appointed chief restructuring officer with powers and authority nearly identical to those of a trustee under § 1106.

Doubling down on the statement by its attorney during the hearing on August 11, 2015, Hartford's supplemental points and authorities state that what it refers to as a "Response" [dkt. 170], "simply did not constitute a request for the court to appoint a trustee, or consent for doing so.  It was a suggested resolution to the problem, offered in the mistaken belief that the parties had an agreement for an appointment of a [chief

16

restructuring officer]." [dkt. 420 at 6:20-22].  Hartford also
suggests that even if it somehow consented to the appointment of
a chief restructuring officer, it consented only in the Tollenaar
case and not in the Friendly Pastures or T Bar M cases.
Hartford's argument is not persuasive, and it is not credible.

The conclusion of the document referenced above as
Hartford's "Response" unambiguously states: "For the reasons set
forth above, Hartford respectfully requests that the court order
the employment of a [chief restructuring officer] under the terms
and conditions set forth above, and such additional terms and
conditions consistent therewith."  [Id. at 6:20-21].  That
"Response" also states that "Hartford requests that the court
appoint a [chief restructuring officer] in the above-referenced
cases under the following terms and conditions[.]" [dkt. 170 at
2:15-16].  Hartford requested the appointment of a chief
restructuring officer on the basis that such an appointment was
"in the best interest of the creditors and the estate[.]" [dkt.
170 at 2:21-22].  To the court, that sounds an awful lot like the
standard for appointment of a trustee under § 1104(a)(2).

Hartford also sought to empower its court-appointed chief
restructuring officer with the authority to: (1) manage and
control all of the day-to-day operation of debtors' dairy
business; (2) complete all required reports; (3) market and sell
assets; (4) appear and be heard in all contested matters and
adversary proceedings; (5) inspect and maintain all real property
on which the debtors maintain dairy operations; (6) insure the
existence and maintenance of all required permits to operate the

17

California and Oklahoma dairies; (7) provide information to the parties; and (8) retain professionals.  To the court, those powers sound no different from the powers a trustee would have under § 1106.

Significantly, Hartford filed the document referenced as its "Response" "in each of the above-referenced cases." [Id. at 2:3-5].  The "above-referenced cases" is a reference to the caption which identifies all three debtor entities, i.e., Tollenaar, Friendly Pastures, and T Bar M.  The caption also includes a darkened box next to "Affects ALL DEBTORS."  Thus, despite how Hartford now tries to spin it, the court is persuaded that Hartford asked for affirmative relief in each of the chapter 11 cases in the form of an appointment of a certified restructuring officer with powers equal to that of a trustee.  And now, as with Bank, Hartford must be bound by the consequences that flow from its request.

> (2)  Early on in the case Comerica decided it was beneficial to employ an examiner with expanded powers to divest the debtor's management from control of the debtor's finances and to sell the debtor's assets (consisting primarily of Comerica's collateral) quickly.  Comerica, 2007 WL 7532277 at *7, 14.

Out of concern over an unauthorized and unexplained disappearance, removal, and disposition of its collateral, Bank sought the immediate and urgent appointment of a trustee eight days after the voluntary petitions were filed.  Bank also sought to have a trustee appointed to protect and preserve the value of its collateral which Bank maintained was deteriorating rapidly and was not adequately protected.  Bank even located and

suggested an individual with dairy experience and urged the court to appoint that individual as the trustee.   Thus, Bank was motivated not by an effort to foster the debtors' reorganization or rehabilitation, rather, it was motivated by a desire to have a trustee immediately appointed to preserve, protect, and rapidly liquidate its collateral solely for its benefit.

As noted above, early in the case Hartford also urged the court to divest the debtors of control of all dairy operations and to vest that authority in a court-appointed fiduciary with extensively broad powers that included the authority to inspect and maintain Hartford's real property collateral (with particular emphasis on and attention to permits and environmental concerns unique to Hartford).

These events are corroborated by the trustee.   Immediately after he was appointed, the trustee arranged conference calls with, among others, Bank's and Hartford's counsel and "during th[o]se calls [he] was reminded by the Bank of the West of the perishable and depreciating condition of the dairy herds and by the real estate brokers of the potential loss in value of the real properties at both of the Debtor's ranches should either ranch lose its operating permits and/or certificates." [dkt. 425 at 2:6-15].   In short, both secured creditors sought to have the trustee move quickly to secure and preserve their respective collateral.

> (3)   Comerica was aware early in the case that asset liquidation would not net sufficient amounts to pay administrative expenses and Comerica's claim in full.   Comerica, 2007 WL 7532277 at *14.

Early in this case, Bank was aware the estates were

administratively insolvent and there were insufficient assets to pay its secured claim in full and other administrative costs.

Hartford also took the position that there was no equity in its California and Oklahoma real property collateral.  It also asserted that the estates lacked and estimated $1.2 million necessary to remediate the Oklahoma dairy.  From this the court can infer that Hartford was equally aware that the debtors lacked the $8.4 million necessary to pay its claim in full, the $4.4 million necessary to pay Bank's claim in full, and sufficient funds to pay all other administrative claims in the cases.  In other words, Hartford also knew the estates were administratively insolvent.

> (4)  Comerica controlled the Examiner's actions by limiting the examiner's use of its cash collateral.  Comerica, 2007 WL 7532277 at *6.

Bank controlled trustee's use of its cash collateral.  In fact, Bank consented to the trustee's limited use of its cash collateral for purposes beneficial to the bank, primarily, liquidation of its collateral and operation of the dairy facilities while its collateral was liquidated.

Hartford also placed restrictions on the use of its cash. It loaned the estate $55,000.00; however, it directed the trustee to use those funds to preserve the value of its collateral by acquiring cows for the California dairy in order to avoid the loss of valuable permits.

By restricting what the trustee could do with funds, Bank and Hartford effectively limited the trustee's focus to matters affecting their respective interests and collateral.  Put another

20

way, by restricting the use of their funds, Bank and Hartford
exerted control over the trustee and the trustee's professionals
and thereby caused the trustee to act for their respective
benefits rather than the benefit of the estates and creditors as
a whole.

> (5)   Comerica was closely apprised of, and involved in,
> the marketing and sale of its collateral (Comerica
> counsel found the successful bidder, reviewed and
> approved purchase agreements, and generally
> approved the terms of the agreement). Comerica,
> 2007 WL 7532277 at *3.

Bank worked closely with the trustee in the sale of the
California and Oklahoma dairy herds.  Bank even set the price at
which some of its cows were sold.  Bank also wanted its
collateral liquidated immediately.

Hartford also demanded immediate action and attention from
the trustee with respect to its collateral inasmuch as it sought
to maintain ongoing dairy operations to prevent the potential
loss of operating permits which it feared would adversely affect
the value of the real property.  The trustee also worked closely
with Hartford to preserve the value of Hartford's California real
property by maintaining that collateral as a "wet" dairy and with
regards to remedial actions at the Oklahoma property.

> (6)   Comerica used the bankruptcy process to accomplish
> its pre-petition goals of selling collateral, i.e,
> use of the bankruptcy court and process to seek an
> examiner with expanded powers to sell its
> collateral. Comerica, 2007 WL 7532277 at *7.

Bank's pre-petition goal was to liquidate its collateral
under a forbearance agreement with the debtors.  Rather than
moving for stay relief in order to pursue that goal on its own,
Bank worked with and encouraged the trustee to sell the

21

California and Oklahoma dairy herds.  Bank thus accomplished its pre-petition business objective post-petition through the trustee and the trustee's professionals.

Hartford's plan to sell the California and Oklahoma dairies also appears to have originated pre-petition.  Hartford's pre-petition broker was retained post-petition to continue Hartford's marketing and sale efforts related to its California and Oklahoma collateral.  Hartford also references "offers" on those properties and its broker notes that the value of those properties would be adversely affected by the loss of permits and a failure to address remediation issues associated with the Oklahoma dairy.  Thus, through the trustee's efforts, Hartford was able to avoid significant disruption in its efforts to market and sell its real estate collateral which facilitated and furthered its pre-petition goal.

> (7)  Comerica filed, but didn't follow through, on a stay relief motion preferring instead to allow the examiner to sell through the bankruptcy court. Comerica, 2007 WL 7532277 at * 7.

Bank never moved for stay relief, opting instead to have the trustee sell its collateral.

Hartford sought stay relief, but only after the trustee had taken significant steps to preserve value of its collateral through permit retention and remediation efforts.

> (8)  Comerica ultimately benefitted from the Examiner's sale of the debtors' assets through the bankruptcy court, thereby avoiding cost of stay relief litigation, marketing, liquidation, - and general expenses associated with personal property sales. Comerica, 2007 WL 7532277 at *7.

By allowing the trustee to sell substantially all of its

collateral through the bankruptcy court, Bank avoided the cost of
stay relief litigation.  It also avoided the physical,
logistical, and financial burden associated with assuming care
and control over dairy herds consisting of over a thousand cows
located in two different states and with moving those cows off
the debtors' California and Oklahoma dairy properties.  Overall,
Bank benefitted tremendously from the efforts of the trustee and
the trustee's professionals.  Indeed, Bank received a significant
benefit with very little, if any, associated burden.

Hartford also benefitted from the efforts of the trustee and
the trustee's professionals.  The trustee maintained the
California dairy as a "wet" operation which resulted in a
retention of valuable permits associated with that dairy facility
and the preservation of value.  The trustee also facilitated
remedial actions on the Oklahoma property sufficient to avoid the
loss of permits associated with that property and, likewise,
preserve significant value in that property as well.

2.   Factors Weigh in Favor of Finding Implied Consent.

The court agrees with and is persuaded by the BAP's ultimate
conclusion in Comerica:  When a secured creditor with a lien on
almost all of a debtor's assets secures the appointment of a
trustee immediately after a petition is filed, persuades the
trustee to delve into the debtor's financial affairs, works
closely with the trustee to liquidate, protect, and/or preserve
its collateral exclusively for its benefit, and all the while
knows that the estate is administratively insolvent, the secured
creditor impliedly consents to a surcharge of its collateral for

23

expenses resulting from those acts which may include the costs of administration.  This is precisely what occurred here.

Bank and Hartford - the debtors' two primary secured creditors with liens on nearly all of the debtors' assets – milked these estates for what they were worth.  Both secured creditors knew that the estates were administratively insolvent and, yet, both encouraged the trustee to engage in acts from which they benefitted significantly.  As explained above, their involvement with the trustee and their participation in the affairs of these chapter 11 cases exceeded mere cooperation.  Therefore, on balance of the factors set forth above and for the reasons stated therein, the court is persuaded that Bank and Hartford both consented to a surcharge of their respective collateral for the expenses the trustee and the trustee's professionals incurred in the administration of these chapter 11 cases.  The question now is how the amount of the surcharge which the court will allow based on consent, less the amount previously authorized under the objective test, should be equitably allocated.

C.    Fourth Issue: Allocation of Surcharge Based on Implied
        Consent.

The surcharge authorized under the objective test totals $107,412.00.  That leaves a balance of $161,942.42 subject to surcharge under the subjective test based on Bank's and Hartford's implied consent.  The parties have proposed two methods by which a surcharge based on consent should be

24

allocated.[9]

Bank proposes a collateral-based formula by which the court would prorate the consent surcharge between Bank and Hartford based on the size of their respective secured claims. Bank notes that the ratio of its $4,399,456.00 secured claim to Hartford's $8,114,267.00 secured claim is approximately 1.8 to 1. Translated into percentages, this results in Bank paying 35% and Hartford paying 65% of the total outstanding surcharge. Applying this ratio to the $161,942.82 referenced above, Bank's prorata share would be $56,679.99 and Hartford's prorata share would be $105,262.83.

The trustee, on the other hand, proposes a benefit-based formula based on a ratio of documented trustee and attorney time spent on each creditor's respective operations. According to the trustee, this results in a ratio that allocates 66% to Bank and 34% to Hartford. Translated to dollars, of the $161,942.82 consent surcharge referenced above, Bank would pay $106,882.26 and Hartford would pay $55,060.55 – almost the reverse of the Bank's proposed formula.

The court will adopt the trustee's formula. Although Hartford's debt exceeds Bank's, Bank's collateral consisted primarily of live animals making that collateral more labor intensive with respect to care, feeding, maintenance, transportation, and disposition. Hartford, on the other hand,

---

[9]Hartford proposes no formula for allocation. Its position is simply that it did not consent to a surcharge in the first instance. As noted above, the court has determined otherwise.

holds passive collateral in the form of real estate.  And
although that real estate collateral required some attention with
respect to permits and remediation, Hartford assumed control over
both processes by seeking stay relief and the appointment of a
receiver in state court whereas Bank allowed the trustee to
service and liquidate its collateral for its benefit throughout
the case.  It would not be equitable under these circumstances to
charge Hartford with a greater share of the outstanding consent
surcharge.  Therefore, in addition to the amounts ordered above,
the court authorizes an additional surcharge of Bank's collateral
in the amount of $106,882.26 and an additional surcharge of
Hartford's collateral in the amount of $55,060.55 based on each
respective secured creditor's implied consent.

**CONCLUSION**

For the reasons stated above, the trustee's surcharge motion
will be GRANTED.

The total surcharge to Bank shall be $153,840.97.

The total surcharge to Hartford shall be $115,513.84,
reduced by Hartford's $55,000 loan to the estate which has a
remaining balance of $18,295.32 leaving the total due from
Hartford of $97,218.52.[10]

A separate order will issue.

Dated:  October 5, 2015.

UNITED STATES BANKRUPTCY JUDGE

---

[10]For reference, a chart of the court's calculations is
attached as Appendix 1.

26

## <u>APPENDIX 1</u>

**Objective Standard Surcharge (Direct, Quantified Benefit)**

| Bank | | Hartford |
|---|---|---|
| $ -- | CA Dairy | $ 24,543.79 |
| $ -- | OK Dairy | $ 11,419.50 |
| $ 46,958.71 | Allocated Prof. Fees | $ 24,490.00 |
| $ 46,958.71 | | $ 60,453.29 |

**Subjective Standard Surcharge (Consent)**

| Bank | | Hartford |
|---|---|---|
| $106,882.26 | Implied Consent | $ 55,060.55 |
| $106,882.26 | | $ 55,060.55 |

**Surcharge Totals**

| Bank | | Hartford |
|---|---|---|
| $ 46,958.71 | Obj. Std. Total | $ 60,453.29 |
| $106,882.26 | Sub. Std. Total | $ 55,060.55 |
| $153,840.97 | | $115,513.84 |
| $ -- | Estate Loan | $(18,295.32) |
| $153,840.97 | Total Due | $ 97,218.52 |

**INSTRUCTIONS TO CLERK OF COURT
SERVICE LIST**

The Clerk of Court is instructed to send the attached document, via the BNC, to the following parties:

Richard A. Lapping
540 Pacific Avenue
San Francisco CA 94133

Bruce A. Emard
400 Capitol Mall, 27th Floor
Sacramento CA 95814

Hanno T. Powell
7522 N Colonial Ave #100
Fresno CA 93711

Jason M. Blumberg
501 I St #7-500
Sacramento CA 95814

Jason E. Rios
400 Capitol Mall, Suite #1750
Sacramento CA 95814

Riley C. Walter
205 E. River Park Circle, Ste. 410
Fresno CA 93720